Robert W. Sadowski
Bar Roll No. 514837
SADOWSKI KATZ LLP
830 Third Ave, Fifth Floor
New York, New York 10022
Tel. No.: (646) 503-5341

*Attorneys for Plaintiff Kenneth McVeigh*

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| KENNETH McVEIGH, | |
| Plaintiff, | **COMPLAINT** |
| - against - | Civ. No.: |
| PLAZA CONSTRUCTION LLC;<br>PLAZA CONSTRUCTION CORP.;<br>FISHER BROTHERS, INC.;<br>CHINA CONSTRUCTION AMERICA. | |
| Defendants. | |

Plaintiff Kenneth McVeigh ("Plaintiff" or "McVeigh"), by and through his attorneys,

Sadowski Katz LLP, alleges for his complaint as follows:

### PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.     This is a civil action brought by Plaintiff Kenneth McVeigh against Plaza

Construction Corporation, Plaza Construction, LLC, (collectively "Plaza"), Fisher Brothers, Inc.,

and China Construction America (collectively, the "Defendants"), under the False Claims Act,

31 U.S.C. § 3730 (h), and New York Finance Law § 191 to recover damages suffered by

Plaintiff caused by Defendants' unlawful retaliation in violation of 31 U.S.C. § 3730(h) and New

York State Finance Law § 191, and to recover damages caused by Defendants' defamation,

intentional/negligent infliction of emotional distress, tortious interference with

contract/prospective business relations, fraudulent inducement, and *prima facie* tort.

2.      Defendants engaged in multiple schemes to cheat its construction clients and falsely claim inflated costs for its construction work, including engaging in bid rigging, submitting falsified timesheets for union laborers, creating fraudulent change orders, directing subcontractors to overbill clients, submitting false and fraudulent permit and variance applications, submitting falsified financial reports, Minority and Women owned Business Enterprise reports and Leadership in Energy and Environmental Design reporting, creating fraudulent ruses to conceal incomplete or violations of building codes, underpaying employees, and other violations for Defendants' various construction projects.

## PLAZA ENTERS INTO AND OPERATES UNDER A DEFERRED PROSECUTION AGREEMENT

3.      Defendant Plaza Construction LLC, successor to Plaza Construction Corp. (collectively "Plaza"), pursuant to a duly authorized Board of Directors Resolution, and the United States Attorney's Office for the Eastern District of New York (the "Office") entered into a Deferred Prosecution Agreement (the "Agreement" or "DPA") resolving the matter captioned *United States of America v. Plaza Construction LLC successor to Plaza Construction Corp.,* 16 CR 532 (NGG), that was filed on November 9, 2016, in the United States District Court for the Eastern District of New York. Ex. A (DPA) at 1. Plaza Construction Corp. merged into Plaza Construction LLC in April 2014. *Id.* at 1 n.1.

4.      The United States filed an Information (the "Information," a copy of which is attached to the DPA as Exhibit B and incorporated by reference) in the United States District Court for the Eastern District of New York charging Plaza with conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349. By executing the DPA, Plaza waived any and all rights it had to have the crimes charged in the Information presented to a grand jury and prosecuted by indictment and waived any and all objections to

2

venue and applicable statutes of limitations. The waiver was knowing, voluntary, and in express reliance on the advice of Plaza's counsel. Ex. A (DPA) at 1-2, ¶ 1.

5.      Plaza accepted and acknowledged as true the facts set forth in the Information, which was incorporated in the DPA by reference. Plaza acknowledged that, as a result of the conduct of certain executives, officers, and employees employed by Plaza during the relevant time period (the "Unlawful Conduct"), Plaza engaged in, and is criminally culpable for, the charged violation of Title 18, United States Code, Section 1349. Ex. A (DPA) at 2, ¶ 2.

6.      Plaza accepted responsibility for the Unlawful Conduct set forth in the Information by entering into the DPA and by among other things:  (i) to pay restitution up to a total amount of two million, two hundred twenty-six thousand, two hundred seventy dollars and nineteen cents ($2,226,270.19) to the victims of the Unlawful Conduct described in the Information, (ii) to pay a financial penalty in the amount of five million, six hundred nineteen thousand, two hundred sixty-nine dollars and ninety-two cents ($5,619,269.92), and (iii) to forfeit the sum of one million, three hundred fifty-thousand, three hundred seventeen dollars and forty-three cents ($1,350,317.43). *Id.* at 2-3, ¶ 3.

7.      Plaza acknowledged that it obtained property that is subject to forfeiture as a result of its violation of Title 18, United States Code, Section 1349. Plaza agreed to forfeit to the United States the sum of one million, three hundred fifty-thousand, three hundred seventeen dollars and forty-three cents ($1,350,317.43) (the "Forfeited Funds") and the Forfeited funds represent property, real or personal, constituting or derived, directly or indirectly, from proceeds traceable to Plaza's violation of Title 18, United States Code, Section 1349. *Id.* at 10, ¶ 12.

8.      Plaza agreed that it shall not, through its attorneys, Board of Directors, directors, officers, employees, and agents, make any public statement, in litigation or otherwise,

3

contradicting the facts set forth in the Information, its admission that those facts established the elements of offenses charged in the Information, and its acceptance of responsibility for the acts of its officers, directors, and employees described in the Information. *Id.* at 14-15, ¶ 21.

9.     The United States Attorney for EDNY charged Plaza as follows in the Information filed on October 14, 2016:  Plaza is a New York-based construction service corporation that provided construction, project management, and consulting services on large-scale publicly and privately funded construction projects. *Id.* (Information) at 1, ¶ 1.

10.     Plaza was one of the largest construction firms in New York.  In 2011, Plaza had more than 200 employees, the majority of which worked in its New York, New York office. Plaza provided construction services on numerous New York City projects, including: (i) the Brooklyn Navy Yard; (ii) the Bronx Terminal Market; (iii) the Federal Reserve Bank of New York; (iv) New York University; and (v) the Empire State Building. *Id.* at 1, ¶ 2.

11.     "Plaza's role on construction projects was typically that of a construction manager.  This often required Plaza to supervise the work done by subcontractors or trade contractors.  As construction manager, Plaza usually executed a construction management agreement, which governed the 'general conditions' costs, such as:  (i) the cost of supplying workers from the Mason Tenders' District Council of Greater New York ("Local 79"), including its labor foremen and laborers (the "Labor Foremen" and "Laborers"); (ii) the cost of supplying workers from certain other trade unions, including the International Brotherhood of Teamsters ("Local 282") and International Union of Operating Engineers ("Locals 14/15")(collectively, with Labor Foremen and Laborers, the "General Conditions Union Workers"); and (iii) the cost of staffing the project with, among other Plaza employees, project executives, project managers,

superintendents, estimators, schedulers[,] and accountants (the "General Conditions Staff Employees"). *Id.* at 2, ¶ 3.

12.     "The pay rates for Plaza's General Conditions Union Workers were defined by collective bargaining agreements, negotiated and entered into with the Contractors' Association of Greater New York ("CAGNY").  The agreements (the "CAGNY Agreements") governed the wage and fringe benefit rates of the General Conditions Union Workers, and also provided that the Labor Foremen were not to be paid on sick days, vacation days[,] and unworked holidays." *Id.* at 2, ¶ 4.

13.     "The terms of construction management agreements between Plaza and its clients (the "Client Contracts"), among other things:  (i) required Plaza to bill its clients for work actually performed by the General Conditions Union Workers; and (ii) prohibited Plaza from billing to its client[']s general expenses, administrative costs and overhead associated with Plaza's home office operations (collectively, the "Administrative Costs").  *Id.* at 2-3, ¶ 5.

14.     "From approximately January 1999 through February 2012, Plaza together with others, devised a scheme to defraud federal, state[,] and local government contracting and funding agencies, as well as private clients (collectively, the "Clients"), by making false representations, and material misstatements and omissions, in billing requisitions submitted by Plaza to its Clients." *Id.* at 3, ¶ 6.

15.     "In furtherance of the fraudulent scheme, beginning in approximately August 2004 and ending in approximately February 2012, Plaza instituted a systemic practice of inserting a hidden surcharge (the "Administrative Fee") into its bills to Clients for the purposes of obtaining payments to offset Administrative Costs.  Specifically, Plaza fraudulently inflated the fringe benefits costs for General Conditions Union Workers and General Conditions Staff

Employees by as much as three percent (3%) of gross wages.  Plaza did not disclose to its Clients the existence of the Administrative Fee and retained the Administrative Fee charges as additional revenue.  At various times during the relevant period, however, Plaza lowered the Administrative Fee that it was secretly levying upon its Clients to contend with changing economic conditions and Plaza's desire to increase its competitiveness in the market place.  In sum, Plaza fraudulently billed its Clients approximately $1,350,317.43 in Administrative Fees."  *Id.* at 3, ¶ 7.

16.    "In furtherance of the fraudulent scheme, from at least 1999 until approximately August 2005, Plaza paid between five and seven hours of unworked or unnecessary "guaranteed" overtime per day to one of its General Labor Foreman (the "General Foreman"), . . .  Plaza, in turn billed its Clients for these hours whether or not the General Foreman had actually worked them."  *Id.* at 3-4, ¶ 8.

17.    "As a further part of the fraudulent overbilling scheme, from at least January 1999 until approximately 2009, Plaza provided unworked holiday pay to Labor Foremen, allowing them to be absent from work for major holidays while Plaza completed and submitted time sheets to its Clients as though the Labor Foremen had worked those days or had been entitled to such pay when, in fact, as Plaza knew, they had not.  Additionally, during the same time period. Plaza: (i) occasionally added one or two hours of unworked or unnecessary "guaranteed" overtime per day, whether worked or not, for two Labor Foremen, . . .; and (ii) allowed these two Labor Foremen to be absent from work for certain vacation days, while Plaza completed and submitted time sheets to its Clients as though the two Labor Foremen had worked those days." *Id.* at 4, ¶ 9.

18.     "Plaza did not disclose to its clients that Plaza was billing the Clients for hours not actually worked or not necessary.  In sum, Plaza improperly billed its Clients approximately $875,952.76 in connection with Plaza's fraudulent overbilling scheme."  *Id.* at 4, ¶ 10.

19.     "In or about and between January 1999 and February 2012, . . . Plaza, together with others, did knowingly and intentionally conspire:  (a) to devise a scheme and artifice to defraud its Clients, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations[,] and promises . . . contrary to Title 18, United States Code, Section 1341 . . ."  *Id.* at 5, ¶ 12(a).

20.     Plaza entered into a Stipulation of Settlement and Decree of Forfeiture in the matter captioned *United States of America v. One Million Three Hundred Seventeen Dollars and Forty-Three Cents, in United States Currency,* 16-cr-00532 (NGG) (Doc. 2-5) filed October 14, 2016.  *Id.* (Stipulation of Settlement and Decree of Forfeiture) at 1.

21.     Plaza agreed that the forfeited payment does not constitute a fine, penalty, or payment of taxes.  *Id.* at 3, ¶ 3.

22.     "Plaza waive[d] its right, if any, to use the instant action or its settlement as a basis for any statutory or constitutional defense in any other civil, criminal[,] or administrative action, including, without limitation, venue, defenses based upon the Double Jeopardy Clause of the Fifth Amendment[,] and the Excessive Fines Clause of the Eight Amendment to the Constitution."  *Id.* at 3, ¶ 5.

23.     As part of the DPA, Plaza agreed to institute remedial measures including:  "Making relevant organizational changes, including: (i) creating General Counsel and Associate General Counsel positions; (ii) establishing a Compliance Department with a Compliance Director, reporting directly to the General Counsel and to PLAZA's CEO and President; (iii)

7

establishing a compliance Committee, comprised of senior executives from different business units, to provide advice on compliance issues as they arise." *Id.* at 3, ¶ 4(a).

24.     Plaza was also required to "[i]stitut[e] annual training for all officers and non-union employees regarding PLAZA's Code of Business Ethics, as well as laws and requirements relevant to specific construction projects. Each employee shall be required to acknowledge in writing that s/he: (i) has reviewed the Code of business Ethics and the annual training materials; (ii) will adhere to the standards set forth therein; and (iii) will report any action inconsistent with those standards." *Id.* at 3, ¶ 4(b).

25.     Plaza was further required to "Ensure that PLAZA's clients' bills do not contain fees beyond those permitted pursuant to the terms of the clients' contracts." *Id.* at 4, ¶ 4(d). Plaza was also required to "ensure that labor hours are accurately recorded on time sheets and clients are billed only for hours worked." *Id.* at 4, ¶ 4(e). The DPA sets for three full pages of compliance obligations including "proactively disclosing to the Office all information concerning any criminal wrongdoing or suspected criminal wrongdoing of any kind, which has not yet been disclosed to the Office, and which is either currently in PLAZA's possession or which may come into its possession in the future, including conduct of the type alleged in the Information." *Id.* at 7, ¶ 7(c).

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. §1331 (Federal Question), and supplemental jurisdiction over the remaining claims.

27.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(l) and (2) because at least one of the Defendants resides or transacts business in the

Southern District of New York and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

28.     Plaintiff McVeigh is a former employee of Plaza.  McVeigh has a Department of Buildings Class 2 Expeditor License, which verifies he has the knowledge of Building Department, New York City Building Code & Zoning Resolution to meet and discuss issues with DOB Plan examiners.  In 2012 he acquired Leadership in Energy and Environmental Design—Accredited Professional—Building Design and Commissions.  He earned a Master of Science in Construction Management in 2013 and is a Project Management Professional since 2014.

29.     Defendant Plaza Construction Corporation is a corporation with an office located at 1065 6th Avenue, New York, New York, and is engaged, *inter alia*, in the business of construction management and general construction.  Plaza is one of the leading general builders in the United States and has been the general contractor and/or construction manager on a number of city, state and federally funded projects, in whole or in part, in the New York Metropolitan Area.

30.     Defendant Plaza Construction LLC is the successor to Plaza Construction Corporation.

31.     Defendant Fisher Brothers, Inc., is the parent of Plaza Construction Corporation.

32.     Defendant China Construction America is the successor parent of Plaza Construction LLC.

## THE FACTS
### Overview of the False and Fraudulent Schemes
**A.     McVeigh is Fraudulently Enticed to Accept a Position at Plaza**

9

33.     Mr. McVeigh was enticed to leave a position as Account Executive with Milrose Consultants with a salary of $105,000, with bonuses of up to $10,000, to work at Plaza on the Interior Department team run by Senior Vice President Michael Moore, which unbeknownst to Mr. McVeigh was on the verge of dissolving and had not yet been awarded the Interiors work on the JPMorgan Chase ("JPMC") construction project.  At the time of his hiring, Plaza was under investigation for fraud by the United States Attorney's Office for the Eastern District of New York.  Mr. McVeigh has a background in construction compliance and has the following credentials:

-Master of Science Degree in Construction Management (New York University);

-Project Management Professional ("PMP");

-Leadership in Energy and Environmental Design Accredited Professional – Building Design and Commissioning ("LEED AP BD+C");

-Department of Buildings Class 2 Expeditor License; and

-OSHA Scaffold License.

34.     On February 10, 2014, Plaza hired McVeigh and he took a cut in salary to $85,000 on the promises that the minimum annual bonus for an Assistant Project Manager position was $30,000, and Mr. McVeigh, having considerable experience, would be promoted to Project Manager with a salary between $130,000 and $150,000 with annual bonus between $30,000 and $50,000 within one year.

**B.     McVeigh Discovers Bid-Rigging and Other Fraud at 4 Metro Tech Center**

35.     Shortly after being hired, McVeigh began working with Plaza Project Manager Dax Pearson on the 10th and 11th floors at 4 MetroTech Center ("MTC").

36.     In McVeigh's presence, JPMC's Project Manager Dan Skrobe gave Plaza Project Manager Dax Pearson a document revealing the bids of Plaza's competitors Structure Tone and Hunter Roberts for 400,000 square feet of renovation projects at MTC—projects that McVeigh was falsely told during his hiring interviews Plaza had already secured.

37.     With this information, Plaza underbid its competitors for the interior work.

38.     Pearson advised McVeigh that Skrobe liked working with Plaza because "we are John Babieracki's guys."  Babieracki was formerly the Director of Operations for Morse Diesel International/AMEC Construction Management, Inc. ("AMEC").  Babieracki left AMEC while AMEC was negotiating settlements for fraud including violations of the Federal Election Campaign Act for reimbursing employees' political contributions as well as a $19 million Deferred Prosecution Agreement for violations of the False Claims Act, and Anti-Kickback Act, all of which occurred under Babieracki's tenure as Director of Operations.  Babieracki left AMEC during the settlement negotiations to work at JPMC as Managing Director of Global Design and Construction.  In addition, Plaza hired Babieracki's son Christopher Babieracki as an estimator.

39.     Plaza Senior Vice President of Interiors Michael Moore joined Plaza in January 1999 after leaving AJ Contracting in the capacity of Project Executive amidst AJ's prosecution for bid-rigging in December 1998.  Moore pulled Dax Pearson off of the 4 MTC project, which was a 400,000 square foot project, leaving McVeigh to handle the work of five people.

40.     McVeigh later learned that Plaza was the subject of a federal investigation for fraud, and that McVeigh was hired and was expected to submit fraudulent timesheets, billings, change orders, Leadership in Energy and Environmental Design ("LEED") reports, and Minority and Women owned Business Enterprises ("MWBE") reports.  Mr. McVeigh holds an LEED

11

credential issued by the USGBC for Building Design and Construction, which required several years of experience, testing and continuing education to maintain.

41.     McVeigh also witnessed construction that was purposely sequenced to create frivolous change orders, such as building a wall, demolishing the same wall, and then building the wall again.   McVeigh was repeatedly asked to sign fraudulent change orders, incorrect manpower assessments, and to sign supervisors' and laborers' fraudulent timesheets overstating hours worked.  McVeigh was pressured to sign construction permit applications and subcontracts—a responsibility typically required of Senior Management.  McVeigh refused to do so, and repeatedly circulated published articles beginning May 1, 2014, concerning the similar Structure Tone fraud to the Plaza Interiors Department team in an attempt to stop the ongoing fraud.

**C.     McVeigh Reports Plaza's Payroll Fraud**

42.     On August 7, 2014, McVeigh emailed the Plaza Human Resources Department to alert them that Plaza made incorrect 401(k) contributions on behalf of its employees, and failed to pay new employees for their first week of work.  While Human Resources corrected the 401(k) contributions, the missing first week of payroll was not corrected.

**D.     McVeigh Reveals Fraud at the JP Morgan Chase Construction Site**

43.     On November 18, 2014, Senior Vice President Michael Moore instructed McVeigh, in writing, to submit fraudulent MWBE data to JPMC so that Plaza remained eligible under its contractual requirements with JPMC.

44.     From November 2014 through January 2015, McVeigh met Senior Vice President Michael Moore about the JPMC project at 277 Park Avenue to inform him that the site superintendent Peter Vivenzio ("Vivenzio") was a repeated a "no show" at work, but billed for no-show time, and that laborers also were billed for time not worked.  Vivenzio submitted

change orders that included "mark-ups or multipliers" for superintendent oversight and laborer time that was not provided.

45.     Moore directed McVeigh to pick up Vivenzio's work, including signing false and fraudulent timesheets, which McVeigh refused to do.  Moore also advised McVeigh that Vivenzio is a "made man" because he is the God Son of Stephen Fisher of Fisher Brothers (Plaza's former owner) and close personal friend of CEO Richard Wood.

46.     Vivenzio wrote in a January 12, 2015 email that he has authorization from Moore to continue billing the JPMC project for full time hours through January 2015, although the project was completed in December 2014.

**E.     McVeigh Reveals Fraud at Plaza's Parent China Construction America**

47.     In February and March 2015, Moore assigned McVeigh the position of Project Manager and Superintendent to oversee Plaza project #5775 concerning switchgear replacement at Plaza's parent company China Construction America's property located at 445 South Street in Morristown, New Jersey.  McVeigh quickly discovered variance and permitting problems at the Morristown site.

48.     The proposed scope of work required a new zoning variance from Morristown.  While McVeigh protested, Plaza management directed McVeigh to submit fraudulent zoning/variance approvals that were obtained for a different scope of work from a different engineer representing a different set of plans, as if they pertained to the current project to avoid the variance process.  Ultimately, when McVeigh was directed to oversee the fraudulent work, he refused.

### F.      McVeigh is Transferred

49.      In response to McVeigh's refusal to take part in the CCA fraud, Moore assigned McVeigh to a Senior Project Manager position to oversee the Columbia Trust Property project, and instructed him to proceed with the project without a signed contract and without permits for construction, sprinkler, or standpipe installations in violation of Department of Building regulations.

### G.      McVeigh Reports His Findings of Fraud to Senior Executives of Plaza Who Become Enraged

50.      On March 9, 2015, McVeigh had a formal meeting with Chief Executive Officer and President of Plaza Richard Wood ("Wood") to discuss the ongoing fraud in the Interiors Department of Plaza.

51.      To this meeting, McVeigh brought emails and contracts to review with Wood.

52.      At the meeting, Wood became furious and screamed for in-house legal counsel Lester Rivelis to join them.  Rivelis then took McVeigh to lunch to "pick [McVeigh's] brain."

53.      Because McVeigh believed the fraud at Plaza may be limited to the Interiors Department, he requested a transfer to the Core & Shell Team, *i.e.* New Buildings Department.

54.      McVeigh had learned from Senior Vice President Ark Latt ("Latt") that he had two or three immediate needs for McVeigh on the New Buildings Projects, including 99 Hudson and UAE Tower and Private residence (37 East 74th Street), with which McVeigh had already been assisting Latt on limited pre-construction services prior to the March 9th meeting.

55.      However, following McVeigh's reports of fraud to Richard Wood, Latt told McVeigh the 99 Hudson and UAE Tower Projects are on hold.  Latt then started loudly assigning McVeigh marketing and assistant entry level work, such as gathering resumes and filings, causing ridicule and laughter among the Interiors team.

14

56.     On March 10th, the day after McVeigh reported fraud, Wood had an intentionally loud verbal exchange with Michael Moore which was heard throughout the office disclosing McVeigh's reporting of fraudulent activities by others in his department.

**H.     Retaliation Escalates as McVeigh Reveals Continuing Fraud at Plaza**

57.     Contrary to Wood's promise to immediately transition McVeigh to the Core and Shell Department to work on one of the several aforementioned projects, Wood had McVeigh remain on Moore's team in an extremely stressful environment.

58.     A long string of retaliation commenced from this point forward.  On March 16, Moore re-scheduled a long-standing Interiors Department meeting from 8:00 am to 7:30 am during which Chief Operations Officer Michael Gabbay ("Gabbay") was to discuss issues of fraud and McVeigh's transition to another team.   McVeigh was purposefully left off the e-mail notice of the rescheduling update and the meeting was held without him.

59.     That same week, Gabbay secretly and confidentially informed McVeigh that he was to join Senior Project Manager Anthony Pasquilini on a project working for Non-Union contractor Triton Construction for Plaza project #5774 known as Essex Crossing Site #1 at 242 Broome Street.  McVeigh was advised he had to immediately report to Triton's main offices on 33rd Street and that he could tell no one including his wife, friends, or colleagues.  McVeigh advised Gabbay that he did not feel this arrangement was appropriate, at which point Gabbay withdrew the request.

60.     After McVeigh refused the position at Triton, Gabbay requested on April 7th, that McVeigh attend on behalf of Plaza the BTEA (Building Trades Employers Association) meeting with the Department of Buildings to discuss High Rise Safety Initiatives.   McVeigh was requested to attend this meeting held on April 14th, which was attended solely by BTEA and C-

suite level construction professionals, as a means of introducing McVeigh to others in the construction industry to blackball him from employment.

61.     In April 2015, Latt loudly asked McVeigh to assist the marketing department in assembling marketing materials for Building #77 at the Brooklyn Navy Yard, which Latt told McVeigh he will be assigned to once the contract is awarded.  However, once the contract was awarded, Latt told McVeigh that the Navy Yard project is not available for McVeigh contending that the owner could not pay for McVeigh's position.  Instead, new hires Logan Hoffman, Domenic D'Ercole, Andrea Krefsky, Jesus Pacanins, Daniel Lambraia, and Steve Gentoso and others were hired for the Navy Yards Project as well as 99 Hudson and UAE Tower Projects to fill the positions of Senior Project Manager, Project Manager and Assistant Project Manager— the vary positions McVeigh was told he would assume.

62.     In the Plaza offices, some new hires were seated next to McVeigh and told to take their questions to McVeigh, while McVeigh was told to sit at his desk without work of his own.

63.     In May 2015, McVeigh was assigned to New Building Projects 550 Vanderbilt and the closeout of a troubled legacy project PS 331 to account for 20% and 80% of his time, respectfully.

64.     McVeigh was physically removed from the Plaza offices and told to work by himself in a field trailer; his requests to attend bid and award meetings were denied; McVeigh was assigned work at intern/secretary levels—handling copiers, trailers, and toilets.

65.     On May 12, 2015, although no longer in the Interiors Department, and moved to a field trailer, McVeigh received a mandatory invitation from Michael Gabbay to attend an Interiors workshop attended by all Interiors project managers and field staff to be held at the

offices of the law firm of Paul Hastings.  In attendance at the May 12, 2015 meeting were Michael Gabbay and Senior Vice President Michael Moore.

66.     The moderator of the workshop Paul Crotty brought up the subject of "telling on your colleagues."  Everyone at the meeting stared at McVeigh.  Nine weeks prior to this meeting, Richard Wood shouted for all in the Plaza office to hear that McVeigh reported fraud.  Crotty asked the workshop attendees what should someone do if team members are potentially hurting Plaza or its clients, the project, or construction.  In response, a superintendent unknown to McVeigh shouted out repeatedly, "We're not fucking rats . . . you do nothing because we're not fucking rats."  The moderator Crotty, Gabbay and Moore said nothing in response to this outburst directed at McVeigh.

67.     Throughout the remainder of 2015, Plaza put out word to all other major construction companies about McVeigh's whistleblowing.  McVeigh could not find another job in construction because he has been blacklisted, and all of his calls and written submissions attempting employment were not answered.  McVeigh applied to numerous large contractors including Hunter Roberts and AECOM/Tishman.  Most contractors did not reply whatsoever. After several interviews with Stellar Management for a position paying $110,000 salary plus a discretionary bonus, McVeigh received an offer, however after brief follow-up telephone conversations and e-mails, Stellar stopped responding or ended the telephone conversations as quickly as possible.  McVeigh received the same type of response from his former employer Milrose Consultants.  Lou Milo at Milrose was McVeigh's top reference and offered McVeigh his old job back, but when McVeigh followed up a couple of days later, Milo ended the telephone as quickly as possible, and McVeigh never heard from Milo again, losing both a job and his best reference.

68.     McVeigh's work at 550 Vanderbilt was limited to non-project manager work and drafting compliance reports.  McVeigh became concerned because reports were coming in showing non-compliance with MWBE, LEED, and construction inspections, which all required immediate action to correct.  Plaza took no actions to correct these problems.

69.     From December 2015 through 2016, Plaza escalated the retaliation against McVeigh.  McVeigh's name was removed from Plaza software, preventing McVeigh from working.  McVeigh's email address was repeatedly dropped from the New York distribution list, so that he failed to receive information about timesheets, submissions, and company protocol.  McVeigh caught the missed emails when new hires and Assistant Project Managers come to McVeigh for advice and showed him the emails he did not receive.  McVeigh notified the IT Director at each occurrence with no response as to the cause of the repeated occurrences.  Plaza IT repeatedly showed up onsite and demanded McVeigh stop work on his computer to install "updates," always starting with McVeigh's computer.  On April 26, 2016, Plaza IT calls McVeigh directly & demands McVeigh log into Anish Sosman's computer while he is on vacation, providing the confidential password.  On June 7, 2016, Plaza IT demands McVeigh stop working on his computer, so they can perform updates to Outlook, Plaza IT left Hard Drive Tracking search screens on McVeigh's computer.  As a result, by July 2016, McVeigh can barely send a handful of emails without freezing his computer.

70.     On July 7th, 2016 McVeigh and his wife attended a China Construction America/Plaza employee event at Alstede Farms in Chester, New Jersey.  As McVeigh entered the dining area to greet his old colleagues, to his embarrassment, the entire table stood up and left the area led by VP of Sales & Marketing David Munoz.  Throughout the event, Munoz kept an eye on McVeigh and called away Trish Nasti and others whom McVeigh engaged in

18

conversation.   David Munoz had previously relied on McVeigh's assistance on several

occasions and raved about McVeigh's performance even citing in a March 22, 2016 email

"Thank you very much, I owe you two now."  In that same conversation, Munoz mentioned

McVeigh's memo "Went over great, I told Lester you were the one that helped us pull it

together."  In-house counsel Lester Rivelis took part in negotiating Plaza's DPA and had been

witness a year earlier to McVeigh's reports of fraud.  Munoz never responded to McVeigh's calls

or emails again.

71.     At 550 Vanderbilt, the fraud continued to escalate.  Plaza installed work without

permits including the installation of major electrical switchgear equipment without a valid

Bureau of Electrical Control permit nor the required switchgear approval from the Electrical

Advisory Board.  At this time, the temporary certificate of occupancy deadline was approaching

and energizing the equipment was a critical milestone to obtain the temporary certificate of

occupancy.  Con Ed will not energize a building without the proper BEC permit and Advisory

Board approval.  McVeigh wrote several emails about the issue and how to resolve it.  Instead,

Jon Drumgool and Antonio Vindigni concocted a plan to have an electrician lie to the owner that

the Advisory Board approval is not required—a patent falsehood.  The electrician lied to Con Ed

and furnished a different electrical permit representing that it was for switchgear, when it was

not.  Moreover, the electrician pulled this permit with McVeigh's name as the authorizing owner

and submitted it to Con Ed under false pretenses.

72.     In another daring scheme, Plaza created a ruse to pass an upcoming elevator

inspection on October 4, 2016 at around 12:00 noon that it knew it would fail because there was

no permanent emergency telephone line in the elevator and no elevator monitoring company was

retained to handle emergencies.  To scam the inspector, Jon Drumgool and Antonio Vindigni

concocted a scheme involving sending out directions to make the temporary telephone line connection appear permanent, and to have the elevator installer re-program the elevator emergency to ring on the Plaza Superintendent's cell phone.  When the inspector called the emergency line, the Superintendent pretended to be an emergency response company and answered the phone, "Westinghouse Elevator Emergency Response . . .  Can you hear me? . . . Do you need assistance?"  The scheme worked, and the inspection passed.

73.     In another ruse to obtain another critical milestone needed for a temporary certificate of occupancy, Plaza built a fake wall to conceal a Boiler Room failure, and thus obtain the authorization to run natural gas to the building.  The Boiler Room could not be completed for months because exterior scaffolding remained in place with "needle beams" penetrating the boiler room enclosure to secure the scaffold in place.  The Boiler Room held several high-pressure natural gas boilers.  Typically, a boiler room should be complete with all requirements including sprinkler coverage(s) as well as complete fire-rated enclosures prior to allowing natural gas authorization and the equipment to operate, which would ultimately provide heat to the building.  Temporary scaffolding penetrations into a rated enclosure are not typically permissible and was identified by Plaza Senior Management as a major issue.  To conceal this failure and condition, Jon Drumgool and Antonio Vindigni concocted a scheme to build a temporary wall in front of the scaffolding penetrations and made the wall look permanent.  The inspection passed, and natural gas was authorized.

74.     In yet another ruse, Plaza coordinated with Global Precast, the pre-cast concrete façade fabricator and installer to delay resolution of inspection deficiencies and use unapproved sealants as a temporary fix to conceal failing façade panels.  Global Precast was the selected fabricator and installer for Building 11 (550 Vanderbilt) and also for Building 14 (535 Carlton

Avenue) constructed by AECOM/Tishman.  Global Concrete was greatly behind schedule in fabricating and delivering the required façade panels.  Tishman's team sent a representative and third-party inspector to check on the status of fabrication and quality of the panels for their project.   At that time, it was discovered the completed panels stored in Global's warehouse were rushed and not fabricated or cured correctly, resulting in numerous panels failing a water penetration test.  Plaza was notified of the deficiencies on the other building but at this point, Plaza had already rushed to install a majority of the panels.  Plaza negotiated to test only a couple of panels for potential water penetration.  The panels repeatedly failed numerous water penetration tests.  Instead of testing additional panels and/or replacing the failed panels, Drumgool advised the contractor to install an unknown mortar which temporarily stopped the water penetration for the last test.  The details of what substance had been applied was withheld from the inspector despite repeated written requests for several months.

75.   There were several more ruses to fraudulently create and inflate change orders and to purposefully drain the construction contingency fund.  For McVeigh's part, he identified in writing to Senior Project Manager Jon Drumgool several contracts whereby the consultant(s) and/or vendor(s) were charging two to three times the price of market rate services and/or stated contract amounts.  In one case, McVeigh obtained a copy of a fraudulent contract submitted to supersede the original executed contract negotiated for lesser pricing.  Drumgool told McVeigh to "not sweat the small stuff" and submitted these fraudulent invoices to the owner.  Plaza routinely instructed many of their vendors and subcontractors to inflate costs for work, materials, and services and/or to have subcontractors perform work out of sequence resulting in extensive re-work by numerous parties.  Many times, the invoices were sent directly to corporate

accounting for processing without review or approval by the responsible party who negotiated the contract, ensuring the fraud went undetected.

76.     McVeigh uncovered additional issues relating to MWBE reporting and Local Community hiring on the 550 Vanderbilt project, a private project with a public financing component.  Plaza engaged consultants to prepare MWBE reports based on incorrect and/or outdated information and contract values.  Many of the reports, spanning pages upon pages of calculations, contained incorrect formulas and missing data, or were based upon incorrect and outdated contract amounts thereby increasing the reported compliance percentage.  Plaza systematically deducted large dollar values of scope from the sum contract totals with the effect of reducing MWBE requirements based on a percentage of the now reduced contract amount.  Lastly, Plaza verbally advised subcontractors at the time of executing contracts not to worry about the stated MWBE "Best Efforts" requirements as Plaza had no intention of complying and advised there was no legal recourse if the subcontractors did not hit the fictitiously reported goals.  Toward this end, most of Plaza's MWBE compliance reports were structured in a way as to predominantly report "MWBE Commitment" amounts pulled from the original signed contracts, thereby repeatedly showing perceived compliance.  Buried in the reports was the actual, verified "Paid to Date" amounts which in many cases was 20% to 30% or more, less than reported and grossly non-compliant with the intent of the MWBE program.

77.     Plaza's electrician was greatly delayed in delivering an emergency generator to the roof via a large crane and had reneged on two previous scheduled deliveries.  A month prior to the third attempt to deliver and install the generator, Plaza's Senior Superintendent and McVeigh both indicated in writing to Plaza senior management that the most recent prepared crane site plan was outdated and still showed placement of the crane in an area that had recently

been excavated and was not suitable to place a crane.  The numerous emails went unanswered and Plaza Senior Project Managers Jon Drumgool and Antonio Vindigni concocted a plan to deliver the crane/generator to the site knowing full well the Department of Buildings would not allow the crane to be erected in an excavated pit and Plaza would then have the contractor submit a change order for roughly $100,000 to reschedule the crane/emergency generator delivery due to unforeseen conditions.  The day of the scheduled delivery, the DOB inspector turned the crane delivery away citing the improper plan and excavated pit, and Plaza began preparing the change order.

78.     In an effort to conceal ongoing payroll padding, Plaza re-assigned recent college graduate and entry level marketing assistant George Semetis to the 550 Vanderbilt project as a Superintendent and billed him full time to the client at an hourly rate of $51.15.  Domenic J. D'Ercole, son of Executive Vice President Tom D'Ercole, was hired straight out of college with an accounting background to be assigned to 550 Vanderbilt as a Project Manager and billed to the client fulltime at an hourly rate of $49.41.  Neither of these individuals had any construction experience whatsoever.

79.     On November 16, 2016, a month after news broke that Plaza entered a Deferred Prosecution Agreement with the United States Attorney for the Eastern District of New York, McVeigh received a telephone call from Senior Project Manager Jon Drumgool and asked if McVeigh could immediately attend a meeting in the field trailer to review Department of Building Schedule B Plumbing fixture requirements for the temporary certificate of occupancy with plumbing contractor MEDCO.  McVeigh advised that he was observing Blower Door Test inspections within the building which could not be interrupted and could not make the meeting.  Unbeknownst to McVeigh, Drumgool halted the meeting until McVeigh returned.  When

McVeigh returned to the field trailer 30-40 minutes later, he was called into the conference room to join Drumgool, Project Manager Antonio Vindigni and MEDCO Plumbing VP Salih Atli (Sal) to review the Schedule B inconsistencies.  McVeigh quickly realized no one at the meeting brought a Schedule B to review and printed up copies for everyone, however, the documentation was pushed aside.  Contrary to Drumgool's stated intention, the parties did not gather to correct the data inconsistencies and rather gathered to "get McVeigh on-board" with the scheme concocted by Drumgool and Vindigni to purposely delay submitting schedule B data and as-built drawings to the design engineer and then to submit incorrect information to the design engineer to ensure confusion, thereby muddying the process by creating a finger pointing scenario and delaying the temporary certificate of occupancy.  Plaza employed this similar tactic in New Buildings such as The Platinum (247 West 46th St), The Element (555 West 59th St), as well as in the Interiors Department.  Gabbay previously asked McVeigh to review the schedule B issues which were at the center of litigation against Plaza on several recent New Buildings.  Previously, at CEO Richard Wood's request, McVeigh had given a DOB Compliance presentation and drafted policy documentation which specifically targeted the importance of reconciling Schedule B issues timely to achieve temporary certificates of occupancy.  McVeigh had even marked up Plaza's typical subcontract language, which Lester Rivelis had promised to implement, to clearly call out these requirements and best practices within all contract scopes.

80.     Drumgool and McVeigh had discussed this repeatedly and Drumgool knew McVeigh would not cooperate with fraud or similar schemes.  Sal from MEDCO and George from Rael Sprinkler, both of which represent trades required to submit updated Schedule B information and as-built drawings, and both had acknowledged their obligations in writing months earlier.  McVeigh published numerous Owner & Contractor meeting minutes dating back

several months specifically tracking this requirement.  When McVeigh advised at the start of the

November 16, 2018 meeting he was not on-board with this scheme, Jon Drumgool and Antonio

Vindigni jumped out of their chairs and screamed at McVeigh.  Vindigni threw a cell phone at

McVeigh; Drumgool threw his chair and ran to McVeigh stuck his finger in McVeigh's face and

screamed, "If you're [McVeigh] not on board [with fraud] then get the fuck off my project site

and go to the main office."  McVeigh left the room, and other employees, Jeannyne Cruz and

David Del Rio, entered the room to break up what they heard as a fight.  Drumgool followed

McVeigh to his office screaming obscenities and insults at him until others convinced Drumgool

to leave the area.  McVeigh went back to work at the building and returned about an hour later

when things should have cooled off.  In the meantime, IT consultants arrived saying there was a

report of a computer virus and that everyone's computer needs to be analyzed immediately,

starting with McVeigh's computer.

81.     After the altercation at the trailer, Drumgool ordered McVeigh immediately to

report to the main office (allowing IT to work on McVeigh's computer) and meet with Senior

Vice President Tom D'Ercole and Senior Vice President and now Chief Operating Officer Chris

Mills "to discuss the incident and [McViegh's] behavior."  When McVeigh arrived at the main

office, his building pass had been de-activated.  Several colleagues asked if McVeigh was okay

as they heard something bad had happened.   Both Vice Presidents repeatedly switched tactics

either criticizing McVeigh's performance or telling McVeigh that he did not appear happy at

Plaza and he would likely be happier working for another contractor.

82.     McVeigh responded that this is all retaliatory treatment that started when he had

the March 9, 2015 meeting with Richard Wood when McVeigh started exposing fraud.  At this

point, Executive Vice President Christopher Mills offered McVeigh two options, either some

role on upcoming projects, or to return to his current project.  Senior Vice President D'Ercole strongly disagreed and withdrew Mill's offer to transfer McVeigh to other projects.  At the end of the meeting with D'Ercole and Mills, it was agreed that McVeigh will stay home for one day and then return to the project site.

83.     McVeigh, however, was not called back to work, and instead instructed to stay home indefinitely until, on November 22, 2016, Tom D'Ercole called McVeigh to the Plaza main office for a meeting.  Attending the meeting were D'Ercole and Human Resource Director Amy Shapiro, who presented McVeigh with a false inflammatory write-up about the November 16 incident.  They pressured McVeigh to sign the statement; he refused and instead recirculated the emails and documentation concerning fraud that he had initially shared with CEO Richard Wood on March 9, 2015.

84.     At the November 22, 2016 meeting, D'Ercole also referred to a letter from LEED consultant Palladino Associates indicating that McVeigh's report of LEED failures was incorrect, and the project was satisfactory.

85.     McVeigh returned to work on December 1, 2016, when he was dressed down in front of other employees and stripped of all responsibilities.  McVeigh discovered that his computer had been altered, flash drives deactivated, and his monthly compliance reports had been fraudulently modified, and his emails concerning fraud had been erased from his computer.

86.     McVeigh contacted the LEED consultant, Molly Seltzer, who apologized that McVeigh is about to be fired.  Seltzer stated that she did not know who from her company authored the revised report or why the data had been manipulated.  Selzer asked McVeigh to not raise the issue of the altered reports on his final conference call scheduled for later that day to transition oversight of the LEED program to Plaza Project Manager Nick Lucarelli.

87.     On McVeigh's last conference call, he did raise the issue of the falsified LEED reports, to which a new senior consultant Hawkins Thomas, admitted making up the data in the new report and further admitted that "LEED doesn't check."  When McVeigh pushed back that the LEED Tracker should be based on actual GMP figures tied to the project and not false figures . . . Hawkins responded, "I don't want to mindfuck this whole thing."  The LEED consultant, Palladino Associates, then sent an email rescinding the falsified report, and McVeigh asked Human Resources to document all of this is his personnel file.

88.     McVeigh would come to find that much of his work and reporting for the 550 Vanderbilt project to correct fraudulent overbilling, fraudulent change orders, fraudulent MWBE & LEED reporting, doctored inspections & faulty construction was simply being overwritten with new reports which were not based on valid data.

89.     The next day December 2, 2016, Kenneth Breen of Paul Hastings reached out to McVeigh about McVeigh's recent reports of fraud without acknowledging McVeigh reported this fraud to CEO Richard Wood stretching back a year and a half earlier.  McVeigh declined to meet with Breen because McVeigh wanted to retain a lawyer for the meeting.

90.     Plaza retained Paul Hastings to negotiate its Deferred Prosecution Agreement, it used Paul Hastings offices to host bogus training sessions ostensibly to improve compliance— while continuing to commit fraud.  The meetings at Paul Hastings were used to call McVeigh "a rat," and intimidate Plaza employees to remain silent.  Paul Hastings was now asking McVeigh to leave his workplace and come to their Manhattan office to take part in what McVeigh believed to be a bogus investigation (about allegations McVeigh made 1.5 years prior) following the bogus manufactured HR event and IT intervention all taking place mere weeks after Plaza's DPA was finalized.

91.     On December 7, 2016, as McVeigh was re-scheduled to meet Kenneth Breen, McVeigh realized that Plaza was actively deleting McVeigh's emails concerning his reports of fraudulent activity, including emails regarding Plaza's parent company China Construction America.  McVeigh declined to meet with Breen.

**I.      McVeigh Was an Outstanding Employee and Commended by Plaza**

92.     The year prior and several days before McVeigh reported his findings of fraud, Plaza recognized McVeigh as an outstanding employee.  McVeigh received accolades for his performance and the level of analysis on former and current projects and for pre-litigation discussions concerning the Department of Buildings Compliance.

93.     McVeigh earned 2014 Outstanding Staff Member Award from CEO Richard Wood.

94.     McVeigh earned special recognition as an office holiday party with a gift of a Mont Blanc pen from Richard Wood.

95.     Wood personally asked McVeigh to visit China on Plaza's behalf to evaluate investment opportunities; Plaza paid for expedited passport and visa for his visit to China.  McVeigh also received accolades from Richard Wood and Senior Vice Presidents for his expertise in project management and overall compliance knowledge.  Wood and others repeatedly tasked McVeigh to analyze and assist in reconciling failed legacy projects, to assist current projects, and to lead several taskforces to allegedly improve operations.

96.     McVeigh was asked to provide a three-hour Department of Buildings presentation he provided to the entire Plaza Interiors Department that was held at Paul Hastings offices and received numerous commendations for this work.

97.     Plaza, along with its parent companies CCA and Fisher Brothers, have engaged in retaliatory treatment of McVeigh, including fraudulent inducement, tortious interference with

contract, and intentional and negligent infliction of emotion distress, along with other actionable claims.

**J.     McVeigh Contacts the United States Attorney's Office for the Eastern District of New York to Report Plaza's Fraudulent Activity**

98.     On December 8, 2016, McVeigh called Assistant United States Attorney Whitman Knapp to schedule a meeting to report Plaza's fraudulent activities.

99.     On December 9, 2016, McVeigh met with Knapp and fellow AUSA Jonathan Lax and three others.  McVeigh was presented with a prepared binder with his e-mails and asked to explain the significance of the emails and how frauds were perpetrated.

100.    Upon information and belief, Plaza learned that McVeigh met with and disclosed to the United States Attorney's office the fraud he uncovered at Plaza.

101.    Plaza's actions toward Mr. McVeigh are in direct contravention of the Deferred Prosecution Agreement with the United States Attorney's Office for the Eastern District of New York.

102.    Upon information and belief, the persons affiliated with Defendants and/or other principals associated with Defendants have retaliated against McVeigh by making false statements about him, his veracity, and his trustworthiness to prospective contractors, subcontractors, vendors, the design community, and project owners with the purpose of interfering with his livelihood, causing him to lose prospective employment, and causing McVeigh to lose lucrative job opportunities.

103.    Defendants' defamatory attacks and active attempts to interfere with new employment, as a direct result of Defendants' acts, Plaintiff was harmed and lost several job opportunities.  He lost his annual salary and his benefits.

104.    As a result of Defendants' retaliatory and tortious actions, which were egregious, wanton, and shock the conscience, Plaintiff has suffered economic damages, including, but not limited to, the loss of jobs, expenses in seeking new work, lost wages, and injury related to this personal hardship and Defendants' threatening conduct, such as emotional distress, anxiety, anguish, and reputational damage.

**FIRST CLAIM**
**Violations of the Federal False Claims Act**
**(31 U.S.C. § 3730(h))**
**Retaliation**

105.    Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

106.    Defendants violated Section § 3730(h) of the False Claims Act, 31 U.S.C. § 3730(h).

107.    Defendants have intentionally retaliated against Relator by marginalizing him and terminating him, by defaming him, and by harming his employment opportunities.  Such conduct by Defendants was due to Plaintiff's actions taken in furtherance of his investigation and exposing Defendants' fraud, and Defendants had actual and constructive knowledge of such actions.

108.    Such conduct by Defendants has damaged Relator in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

**SECOND CLAIM**
**Violations of New York State Finance Law**
**(§ 191)**
**Retaliation**

109.    Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

110.    Defendants violated Section § 191 of the New York State Finance Law.

111.    Defendants have intentionally retaliated against Relator by marginalizing him and terminating him, by defaming him, and by harming his employment opportunities.  Such conduct by Defendants was due to Plaintiff's actions taken in furtherance of his investigation and exposing Defendants' fraud, and Defendants had actual and constructive knowledge of such actions.

112.    Such conduct by Defendants has damaged Relator in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

### THIRD CLAIM
### Defamation

113.    Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

114.    Defendants defamed Plaintiff both by slander and libel.

115.    Defendants made false statements about Plaintiff that identified him, both orally and in writing, and the statements were publicized.

116.    Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

### FOURTH CLAIM
### Intentional Infliction of Emotional Distress

117.    Relator incorporates by reference the paragraphs above as if fully set forth herein.

118.    Defendants' intentional and reckless, and outrageous acts of retaliation, including their defamatory statements, their attempts to physically threaten and intimidate him, their false reporting, and their attempts to harm Plaintiff's employment opportunities were intended to and did in fact cause Plaintiff severe emotional distress.

119.     Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

## FIFTH CLAIM
### Negligent Infliction of Emotional Distress

120.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

121.     Defendants' negligent acts of retaliation, including their defamatory statements, their attempts to physically threaten and intimidate him, and their attempts to harm Relator's employment opportunities intended to and did in fact cause Plaintiff severe emotional distress.

122.     Defendants owed a special duty to Plaintiff as a whistleblower.

123.     Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

## SIXTH CLAIM
### Tortious Interference with Contract

124.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

125.     Plaintiff had multiple valid opportunities for employment with third parties including, his past employer, and with clients through that employer.

126.     Defendants knew of these contracts and intentionally interfered with them, causing their abandonment.

127.     Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

## SEVENTH CLAIM

### Tortious Interference with Prospective Business Relations

128.    Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

129.    Plaintiff had business relations with third parties including his past employer, and with other clients and potential employers.

130.    Defendants sought to harm and did harm those relationships by acting in using dishonest, unfair means, and with an improper purpose, which caused Plaintiff damages.

131.    Defendants' conduct amounted to criminal activity and/or to an independent tort, and was done for the sole purpose of inflicting intentional harm.

132.    Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

## EIGHTH CLAIM

### *Prima Facie* Tort

133.    Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

134.    Defendants, without any excuse or justification, intended and did inflict harm to Plaintiff, by a series of acts which would otherwise be lawful, which resulted in special damages.

135.    Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

## NINTH CLAIM

### Fraudulent Inducement

136.    Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

137.    Defendants made false representations and promises to Plaintiff to induce him to leave a more lucrative position and work for Plaza and take part in Plaza's fraudulent activities.

138.    Defendants failed to honor their commitments to Plaintiff, harming Plaintiff with lost opportunities and subjecting Plaintiff to a workplace rife with fraud, which Plaza intended Plaintiff to take part in, potentially exposing Plaintiff to be implicated in Plaza's fraud.

139.    Such conduct by Defendants has damaged Plaintiff in a substantial amount, to be determined at trial.

WHEREFORE, Plaintiff Kenneth McVeigh requests that judgment be entered in his

favor and against Defendants as follows:

   (a)   On the First and Second Claim for Relief (violations of the False Claims Act, 31 U.S.C. § 3730(h) and New York Finance Law § 191), awarding Relator two times back pay, interest on the back pay, and all special damages sustained as a result of the discrimination including but not limited to litigation costs and reasonable attorney's fees;

   (b)  On the Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Claims for Relief, awarding the Relator damages to be determined at trial, including but not limited to compensatory damages, special damages, punitive damages, litigation costs, and reasonable attorney's fees; and

   (c)  Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED**

Dated: New York, New York
           October 1, 2018

                                        SADOWSKI KATZ LLP

                              By:   s/Robert W. Sadsowski_____
                                        Robert W. Sadowski
                                        830 Third Avenue, Fifth Floor
                                        New York, New York  10022
                                        Telephone: (646) 503-5341
                                        rsadowski@sadowskikatz.com